**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

THREE LOWER COUNTIES          *
COMMUNITY HEALTH SERVICES, INC. *
                              *
        v.                    *   Civil Action WMN-10-2488
                              *
MARYLAND DEPARTMENT OF HEALTH *
AND MENTAL HYGIENE <u>et al.</u>     *

        *    *    *    *    *    *    *    *    *    *    *    *

**<u>MEMORANDUM</u>**

Before this Court are two dispositive motions: Defendants'
Motion to Dismiss, ECF No. 6; and Plaintiff's Motion for Summary
Judgment, ECF No. 17.[1]  Both motions are fully briefed.  Upon
review of the pleadings, facts and applicable law, the Court
determines that Defendants' Motion to Dismiss will be denied,
and Plaintiff's Motion for Summary Judgment will be granted in
part and denied in part.

**I.    INTRODUCTION**

Plaintiff Three Lower Counties Community Health Services,
Inc. (TLC) is a nonprofit Maryland corporation designated under
the Federal Medicaid statute as a Federally-Qualified Health
Center (FQHC).  As an FQHC, TLC provides both primary care and

---

[1] Also before this Court are: The Department's Motion for Leave to
File a Surreply on TLC's summary judgment motion, ECF No. 21;
and TLC's Motion for Leave to File a Response to Defendant's
Surreply, ECF No. 22.  In accordance with Local Rule 105.2(a),
the Court will grant both motions.

emergency health care services to low-income patients who lack insurance or the capacity to pay for medical attention.

Defendant Maryland Department of Health and Mental Hygiene (the Department) is the Maryland state bureau charged with administering the Medicaid program, and it therefore coordinates payment to FQHCs for services FQHCs render to patients covered by Medicaid. Defendant John Colmers, sued here in his official capacity, is the Secretary of the Department.

A. THE PROSPECTIVE PAYMENT SYSTEM

The process by which community health providers seek and receive reimbursement under the Medicaid Act is governed by statute and regulation. Effective January 2001, Congress amended the FQHC reimbursement process and implemented the Prospective Payment System (PPS).[2] PPS required that FQHCs be reimbursed prospectively at a predetermined per-patient-visit rate. The per-visit rate was a flat fee paid regardless of the actual services provided to the patient during each patient visit. The rate was originally calculated as one-hundred percent of the average of a particular FQHC's "reasonable costs" per patient for covered services in federal fiscal years 1999 and 2000. To account for inflation in the cost of health care

_____

[2] In January 2010, TLC switched from the Prospective Payment System to the Alternative Payment System (APS), which provides an altogether different mechanism for reimbursement. The mechanics of the APS are irrelevant to this lawsuit.

services, the rate was indexed to the Medicare Economic Index and therefore increased each year.

Similar to systems found in many other states, the Maryland Medicaid administrative regime utilizes Managed Care Organizations, or MCOs (more commonly known as Health Maintenance Organizations or HMOs), to arrange for the delivery of health care services on a prepaid, capitated basis to individuals who enroll with the MCO. In exchange for this service, each MCO receives capitation payments from the Department based upon the number of enrollees in the MCO. The MCO, in turn, contracts with various health care providers, including FQHCs, which provide health care services at a predetermined rate. The providers with which the MCO has contracts are considered "in-network" providers, and MCO enrollees are either required or strongly encouraged to use in-network providers. Providers without MCO contracts are "out-of-network." Subject to at least one exception discussed below, an MCO is not required to pay for services rendered to the MCO's enrollees by out-of-network providers.

Under PPS, MCOs reimbursed FQHCs for services the FQHCs delivered to MCO enrollees, but the MCOs did so at prevailing per-patient-visit market rates set forth in contracts between each MCO and FQHC. The per-patient-visit market rate, however was frequently less than the flat "reasonable costs" rate to

which the FQHC was entitled by law.  As mandated by Congress, the difference between the two rates was paid directly to the FQHCs by the State of Maryland via the Department's "supplemental payments."  Specifically, the Medicaid Act required Maryland to pay FQHCs fully compensatory supplemental payments within four months of receiving a claim for reimbursement.

### B.   THE PROVISION OF SUPPLEMENTAL PAYMENTS UNDER PPS

The Department's supplemental payments were issued in two rounds.  Because FQHCs were entitled to prospective payment for services they expected to deliver, the Department first issued "interim supplemental payments" to each FQHC every three months. The interim supplemental payments were based upon the number of patients the FQHC treated in the same quarter of the previous year.  If, after the FQHC actually treated its patients, the interim supplemental payment was insufficient, the Department issued a "reconciliation payment" for the difference.  In practice, the reimbursement process proceeded as follows:

1. First, the Department calculated and issued the interim supplemental payment.  To do so, the Department forecasted the number of Medicaid-eligible patients the FQHC would likely treat over the upcoming three months.  It multiplied the number of expected patient visits by the per-patient-visit "supplemental rate," which was equivalent to the "reasonable costs" rate less the MCO market rate.  The product equaled the interim supplemental payment, which the Department paid by check each quarter to each FQHC.  These

payments were issued before the FQHC actually provided any services.

2.  Second, the FQHC treated its patients and recorded all services it provided to each patient as "encounter information." The encounter information was then submitted to each patient's respective MCO as a claim for reimbursement.

3.  Third, the MCOs processed the encounter information, tallied the number of reimbursable visits, and reimbursed the FQHC based upon a flat per-patient-visit market rate.

4.  Fourth, the MCOs forwarded the encounter information to the Department for further processing.

5.  Lastly, the Department analyzed the data and determined the total number of Medicaid-eligible patients the FQHC actually treated. If the total number of actual patient visits exceeded the forecasted number of patient visits, the Department issued a reconciliation payment for the difference.

Three rounds of payment later—including the Department's interim supplemental payment, the MCOs' market rate reimbursement, and the Department's reconciliation payment—the FQHC should, in theory, have been fully compensated for the services it provided to each Medicaid-eligible patient.

C.  THE TIMING OF SUBMISSION OF CLAIMS FOR REIMBURSEMENT

To implement this system, Maryland created a claims process governed by state regulations. The process first required the FQHC to submit claims for payment directly to a beneficiary's MCO within nine months of providing treatment. See Md. Code Regs. (COMAR) 10.09.36.06A. Upon receipt of the encounter information, the MCO had sixty days to process the claims and

forward the information to the Department. COMAR

10.09.65.15B(2). The Department then had six months to validate

the total the number of Medicaid patients treated by the FQHC

and determine whether reconciliation was necessary given the

interim supplemental payment already paid. COMAR 10.09.08.05-

1(C). Lastly, the regulations gave the Department another

twelve months after the initial six-month period to finally make

the reconciliation payment to the FQHC.[3] Id.

###    D.    OUT-OF-NETWORK EMERGENCY SERVICES

Separately, the Medicaid Act also requires that FQHCs be

fully compensated for providing medically necessary emergency

services that are "immediately required due to an unforeseen

illness, injury or condition," even if the treating FQHC is out-

of-network for the patient. See Three Lower Counties Community

Health Services, Inc. v. Maryland, 498 F.3d 294, 304 (4th Cir.

2007) (Three Lower Counties II). The statute requires the State

of Maryland to ensure all treating FQHCs are fully reimbursed,

although the statute does not specify whether the State or the

MCOs must bear such costs. 42 U.S.C. § 1396b(m)(2)(A)(vii).

---

[3] This eighteen-month period within which the Department
calculated and issued its reconciliation payments was challenged
in earlier litigation and found to violate the Medicaid Act,
which required that such payments be made within four months
after the Department received the claim for reimbursement. This
prior lawsuit is discussed in further detail below.

Consequently, out-of-network FQHCs are entitled to compensation for all qualifying emergency services they provide.

### E.   THE PARTIES' PREVIOUS DISPUTES

The mechanics of this byzantine reimbursement process have spawned at least four lawsuits among these parties in the last ten years.  Most notably and directly relevant to the instant case, TLC sued the Department in 2005 in this Court alleging among other things that (1) the Department's reimbursement scheme, explained above in Subsection C, did not conform to statutorily mandated time requirements, and (2) the Department failed to ensure TLC received payment for out-of-network emergency services.  This Court initially ruled in favor of the Department on summary judgment.  See Three Lower Counties Community Services, Inc. v. State of Maryland Dep't. of Health and Mental Hygiene, No. 05-cv-1280, 2006 WL 997860 (D. Md. Apr. 14, 2006) (Davis, J.) (Three Lower Counties I).

On appeal, however, the Fourth Circuit reversed this Court and ruled in favor of TLC on both of those issues.  See Three Lower Counties II, 498 F.3d at 304-05.  Specifically, the Fourth Circuit held that TLC was entitled to: (1) reimbursement for certain out-of-network emergency services; and (2) "fully compensatory supplemental payments not less frequently than four months after Maryland has received the claim for supplemental payment."  Id. (emphasis in original).  The case was then

remanded on August 24, 2007, to this Court with a mandate to enter judgment in favor of TLC on those two issues. Thereafter, the parties appear to have reached at least a partial settlement of the dispute.[4]

### F. TLC'S COMPLAINT AND THE RELIEF REQUESTED

In the instant case, TLC complains of two very similar issues. First, TLC alleges the Department habitually and consistently underpaid its supplemental payment for services TLC provided to in-network patients under PPS. Second, TLC claims the Department failed to ensure TLC was compensated for emergency services it rendered as an out-of-network provider. Both of these claims attack the Department's reimbursement system as inconsistent with the statutory requirements of the Medicaid Act, and both are brought pursuant to 42 U.S.C. § 1983 (Section 1983).

While TLC's claims are straightforward, the precise nature of the relief it requests is unclear from the Complaint and pleadings. The language of the Complaint appears to ask for both retroactive money damages and prospective injunctive relief. The Complaint seeks an order:

---

[4] The last entry in the docket for Three Lower Counties I, ECF No. 43 in Case No. 05-1280, indicates the parties had yet to reach a mutually agreeable resolution to at least some of the outstanding issues. There are no further filings or Court Orders to provide additional information, so it is unclear whether the parties resolved all of their differences.

> A.    Declaring that [the Department's] failure to
> ensure the right of beneficiaries to TLC's services
> violates the Medicaid statute; and directing [the
> Department] to take necessary actions to correct that
> failure;
>
> B.    Declaring that [the Department's] failure to make
> full and properly accounted for payments to TLC for
> FQHC services provided to Medicaid beneficiaries
> violates the State's duties under the Medicaid
> statute; and directing [the Department] to make full
> payment to TLC for such services rendered in
> accordance with the [Department] issued encounter data
> reports and 42 U.S.C. § 1396a(bb);
>
> C.    Declaring that [the Department's] failure to make
> full and properly accounted for payments to TLC for
> past and future services "immediately required due to
> an unforeseen illness, injury or condition" to
> Medicaid beneficiaries who are enrolled in managed
> care organizations with whom TLC is not contracted
> violates the State's duties under the Medicaid
> statute; and directing [the Department] to make full
> payment to TLC for such services rendered in
> accordance with 42 U.S.C. § 1396b(m)(2)(A)(vii) and 42
> U.S.C. § 1396a(bb).

Compl. 12, ECF No. 2 (emphasis added).  That TLC seeks both

retroactive and prospective relief is supported elsewhere in the

Complaint, which states, "TLC now brings action to obtain proper

supplemental payment . . . for services provided to Medicaid

beneficiaries.  TLC also seeks obtain [sic] reimbursement, both

past and future, for [out-of-network emergency] services . . .

." Compl. 10.  Moreover, in TLC's Motion for Summary Judgment,

TLC requests payment for services rendered to 18,813 Medicaid-

covered patients, and TLC further argues the Department "should

provide TLC with payment for covered out-of-network services already rendered." Mot. Summ. J. 19, 21.

On the other hand, TLC also characterizes this action as one merely seeking enforcement of the Fourth Circuit's decision in Three Lower Counties II. For example, TLC's summary judgment reply brief argues, "Defendant's Opposition virtually ignores that the payment rights upon which TLC's claim rests were secured by the United States Court of Appeals for the Fourth Circuit. . . . This case is about Defendant's failure to comply with that decision." Pl's Summ. J. Reply 2, ECF No. 20. TLC continues, "The case before this Court seeks to collect sums due to TLC as a result of rights already secured under the Fourth Circuit's decision." Id.

As currently alleged in the Complaint, TLC brought this action pursuant to Section 1983 for both retroactive money damages and prospective injunctive relief. TLC's alleged claims are unambiguous, and TLC did not include in its Complaint a separate cause of action for enforcement of the earlier orders.[5] Because TLC limited its Complaint to claims under Section 1983, the Court will not treat this case as an enforcement action and

_____

[5] To seek enforcement of a prior court order, TLC must either move the court in which the relief was originally granted pursuant to Federal Rule of Civil Procedure 70, or allege a common law cause of action predicated upon the Fourth Circuit's earlier decision. The mechanics of a Rule 70 motion are discussed in greater detail below.

will instead consider this an independent action for retroactive money damages and prospective injunctive relief.

### G.   THE MOTIONS UNDER REVIEW

The Department moves to dismiss this lawsuit under Federal Rule of Civil Procedure 12(b)(6) by arguing that the alleged causes of action are: (1) barred by a statute of limitations; (2) barred because TLC did not exhaust available administrative remedies; and (3) not yet ripe for resolution.  TLC disputes these arguments and moves for summary judgment on its claims for deficient supplemental payments and payments for out-of-network visits.

## II.  THE DEPARTMENT'S MOTION TO DISMISS

The Department proffers three arguments to dismiss TLC's Complaint.  First, the Department claims TLC forfeited its right to a remedy because it did not bring this action within the time period required by the applicable statute of limitations. Second, the Department argues this Court does not have jurisdiction to review TLC's claims because TLC did not exhaust its administrative remedies.  Finally, the Department claims TLC's claims are not yet ripe for review.  The Court will consider each argument in turn.

### A.   THE STATUTE OF LIMITATIONS

The Department first argues that TLC is time-barred from pursuing claims premised upon alleged payment deficiencies

dating as far back as 2001. The Medicaid Act, however, does not provide a statute of limitations for deficient supplemental payments or failure to ensure payment for emergency services. See generally 42 U.S.C. § 1396 et seq. When a federal statute fails to provide a statute of limitations, courts typically borrow the most analogous state statute of limitations. Shofer v. Hack Co., 970 F.2d 1316, 1318 (4th Cir. 1992).

To that end, the Department encourages the Court to adopt one of several possible surrogates. Most prominently, the Department proffers a one-year limit governing the period within which a health care provider must submit a claim to the State for reimbursement. Mot. Dismiss 6, ECF No. 6 (citing Md. Code Ann., Health—Gen. § 15-105(b)). This provision is inapposite. It imposes a time limit for routine claim submission during the reimbursement process and has nothing to do with a cause of action for statutory violations. The same is true for other potential surrogates proffered by the Department, including COMAR 10.09.36.06A (giving FQHCs nine months to submit claims for reimbursements), and Md. Code Ann., Insurance § 15-1005(d)(1) (giving health care providers 180 days from the date on which the service was rendered to submit a claim for reimbursement). Furthermore, TLC allegedly does not seek payment for any claims submitted outside the regulatory time

limit; all claims at issue were timely submitted.  Opp'n to Mot.
Dismiss 22, ECF No. 16.

More plausible but no more successful is the Department's
suggestion that the Court analogize TLC's lawsuit to a claim for
breach of the Department's provider agreement with TLC, in which
case the Court would adopt Maryland's one-year statute of
limitations for breach of contract actions against the State.
See Md. Code Ann., State Gov't § 12-202.  While the Medicaid Act
does indeed require states to include certain provisions in
their contracts with providers, this not a breach of contract
action.  Rather, the rights that TLC seeks to vindicate—namely,
its rights to fully compensatory supplemental payments and to
payment for emergency services—are statutory in nature, not
contractual, so the one-year limitation on contract actions does
not apply.

Instead, the most appropriate statute of limitations for
this suit is Maryland's three-year catchall provision for civil
actions.  Md. Code Ann., Courts and Judicial Proceedings § 5-
101.  This statute applies when, as now, no other provision of
the Maryland Code provides a different time period within which
the action must be commenced.  Id.  So long as TLC lodged its
Complaint within three years of the date on which TLC's cause of
action accrued, this action will be deemed timely filed.

The Department, however, argues that TLC's claim accrued long ago, well outside even a three-year statute of limitations, because TLC "knew that the shortfall in supplemental payments had been occurring since the initial implementation of PPS in 2001." ECF No. 6 at 7. In federal court, "a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 181 (4th Cir. 1996) (quotations omitted). Typically, a statute of limitations begins to run when the claim first accrues. In certain cases, however, where a plaintiff challenges the continuing application of an allegedly unlawful practice, the statute of limitations does not begin to run until the violation ends. Virginia Hosp. Assoc. v. Baliles, 868 F.2d 653, 663 (4th Cir. 1989); Rehabilitation Assoc. of Virginia, Inc. v. Kozlowski, 838 F. Supp. 243, 249 (E.D. Vir. 1993) (holding that Virginia's two-year statute of limitations did not apply where plaintiff health care provider challenged ongoing Medicaid reimbursement procedures four years after the procedures were adopted).

Unlike the plaintiffs in Baliles and Kozlowski, TLC does not challenge a procedure currently in use. Nevertheless, TLC does challenge a system that was applied continuously for ten years until January 1, 2010, when TLC switched to APS and the

alleged unlawful PPS reimbursement procedures ceased.  The clock

on TLC's three-year statute of limitations, therefore, did not

begin ticking until January 2010.  TLC filed the instant action

in Maryland state court on August 11, 2010, less than nine

months from the action's accrual and well within three years.

Accordingly, TLC's Complaint is not barred by the statute of

limitations.

B.    EXHAUSTION

The Department next argues that this case should be

dismissed because TLC did not exhaust its administrative

remedies prior to filing this lawsuit under Section 1983.  The

Department further argues that Congress implicitly required

exhaustion for such claims when it passed the Medicaid Act,

because the statute explicitly requires states to implement an

administrative appeal system, and because Congress delegated the

responsibility of performing reimbursement calculations to the

states.

The Supreme Court has held that the federal remedy in a

Section 1983 action "is supplementary to the state remedy, and

the latter need not be first sought and refused before the

federal one is invoked."  Patsy v. Bd. of Regents, 457 U.S. 496,

507 (1982) (citing Monroe v. Pape, 365 U.S. 167 (1961)).  Thus,

"exhaustion of state administrative remedies is generally not

required prior to bringing an action under § 1983 in federal

court." <u>Talbot v. Lucy Corr Nursing Home</u>, 118 F.3d 215, 219 (4th Cir. 1997).

Courts have recognized two exceptions to the general rule opposing exhaustion. The first exception applies when Congress explicitly requires exhaustion prior to launching a lawsuit under a particular federal law pursuant to Section 1983. <u>Id.</u> The second exception occurs when Congress, as demonstrated through Congressional action, intended to require the exhaustion of administrative remedies but did not explicitly say so. <u>Id.</u> In both cases, Congressional intent is paramount.

The first exception has no relevance to the instant case, because the Medicaid statute does not explicitly require exhaustion in this type of action. Instead, Defendants ask the Court to rely upon the second exception. The second exception, however, must be read within the larger context of Section 1983 and its animating premises. Section 1983 supplements state remedial mechanisms, which is to say it is not subordinate to them. <u>See</u> <u>Patsy</u>, 457 U.S. at 507. Parallel avenues of review are therefore consistent with Section 1983's auxiliary nature and do not alone evince Congressional intent to require administrative exhaustion. <u>Alacare, Inc.-North v. Baggiano</u>, 785 F.2d 963, 967 (11th Cir. 1986), <u>cert. denied</u>, 479 U.S. 829 (1986). Indeed, "the policies of section 1983 <u>strongly disfavor</u> the imposition of additional exhaustion requirements." <u>Jeremy</u>

<u>H. v. Mt. Lebanon Sch. Dist.</u>, 95 F.3d 272, 283 n.20 (3d Cir. 1996) (emphasis added). "If there is doubt as to whether an exception applies, courts should refrain from requiring exhaustion in § 1983 suits because [the Supreme Court in] <u>Patsy</u> le[ft] no doubt that the presumption is <u>strongly</u> in favor of no exception." <u>Alacare</u>, 785 F.2d at 967 (emphasis in original, internal quotations omitted).

Nevertheless, Congressional intent rules the roost, and when Congress implicitly requires exhaustion, as it sometimes does when plaintiffs deploy Section 1983 to vindicate federal statutory rights and not constitutional rights, the second exception may apply. <u>See, e.g.</u>, <u>Taylor v. Vermont Dept. of Ed.</u>, 313 F.3d 768, 788 (2nd Cir. 2002). If application of the exhaustion requirement is consistent with the statutory scheme, then courts must require plaintiffs to pursue available administrative remedies before proceeding in federal court. <u>Id.</u> To determine legislative intent, courts generally focus on the role Congress has assigned the relevant federal or state agency. <u>Id.</u> at 789. For example, if Congress were to require a state to implement an administrative appeal process, as it did here in the Medicaid Act, that requirement may provide at least partial evidence that Congress intended to alleviate a burden on federal courts by forcing claims through an administrative pipeline first. <u>See Alacare</u>, 785 F.2d at 967. Yet, "the mere fact that

Congress create[s] parallel or duplicative avenues for review does not, standing alone, demonstrate an implicit purpose to impose an exhaustion requirement." Talbot, 118 F.3d at 219 (quoting Alacare, 785 F.2d at 968).

The Fourth Circuit has not yet decided the precise question presented here.[6] To wit, the Court has found no controlling authority on whether the Medicaid Act implicitly requires exhaustion of state administrative remedies before an FQHC may sue under Section 1983 to contest the determination of entitlement benefits. In Talbot, the Fourth Circuit answered negatively whether the Medicare statute, not the Medicaid Act, implicitly required exhaustion for claims regarding violations of the statute's nursing home resident rights provisions. Talbot, relied heavily on the Eleventh Circuit's opinion in Alacare, which held that the Medicaid Act did not implicitly require exhaustion before pursuing Section 1983 relief in federal court. While neither binding nor factually identical, this Court is persuaded by Alacare's well-reasoned conclusions.

---

[6] The Department's exhaustion argument is not completely without precedence. The Department cites two district courts in other circuits which have held that exhaustion is required before seeking relief of Medicaid Act violations under Section 1983. See Arden House, Inc. v. Heintz, 612 F. Supp. 81 (D. Conn. 1985); St. Joseph Hosp. v. Electronic Data Sys. Corp., 573 F. Supp. 443 (S.D. Tex. 1983). For the reasons discussed herein, however, this Court declines to follow these decisions.

The question in _Alacare_ was answered within the context of

a plaintiff nursing home operator suing a state Medicaid

administrator after the plaintiff was denied a contract to

provide certain health care services in accordance with the

Medicaid Act.  The _Alacare_ plaintiff, therefore, alleged it was

deprived of its right to engage in a livelihood, whereas the

instant case is largely a monetary dispute, albeit one that

implicates ongoing violations of the Medicaid statute.

Appropriately, the Department attempts to distinguish _Alacare_ on

precisely these grounds by arguing that, given the monetary

nature of the claims in this case, all disputes for payments

must first proceed through state administrative channels because

Congress mandated the creation of those channels specifically to

calculate FQHC payments.

It is true that the Department, as the state bureau charged

with administering the Medicaid reimbursement system, should be

well situated to review an appeal for deficient payments.  It is

not true, however, that the existence of a Department-

administered appeals process is sufficient evidence to conclude

Congress intended to require administrative exhaustion.  _See_

_Talbot_, 118 F.3d at 219.  Furthermore, the result in _Alacare_ did

not depend upon the nature of the claim or the relief sought;

rather, the Eleventh Circuit's opinion was unqualified insofar

as it held that the Medicaid Act does not require exhaustion.

<u>Alacare</u>, 785 F.2d at 969.  For the reasons announced in <u>Alacare</u> and tacitly endorsed by the Fourth Circuit in <u>Talbot</u>, this Court will not abstain from exercising jurisdiction over this dispute and will not require TLC to exhaust state administrative remedies before proceeding with its Section 1983 action.

      <u>C.   RIPENESS</u>

      Last, the Department submits this dispute is not ripe for review because TLC has not yet obtained a final administrative decision.  The Department primarily cites <u>Acorn Land, LLC v. Baltimore County, MD</u>, 648 F. Supp. 2d 742, 749 (D. Md. 2009), to support its argument, a case in which the district court held that the plaintiff's takings claim was not ripe because the plaintiff had failed to exhaust its administrative remedies.  Unfortunately for the Department, the entire ripeness analysis in the district court's <u>Acorn Land</u> opinion was recently reversed by the Fourth Circuit in <u>Acorn Land, LLC. v. Baltimore County, MD</u>, 2010 WL 3736258, *4-*5 (4th Cir. Sept. 21, 2010).  Even if the district court had not been reversed, <u>Acorn Land</u> would not help the Department.  Ripeness doctrine within the context of takings claims has developed idiosyncratically, and the complications caused by the labyrinth of interaction among the tangled competencies of state and local zoning boards are simply not present in a case implicating a relatively straightforward federal statute like the one here.  <u>See</u> 13B Wright, Miller &

Cooper, Federal Practice and Procedure § 3532.1 (3d ed. 2008).

The case therefore lends no support to the Department's argument

and instead bolsters TLC's position.

Defendants also cite Arthur v. Ticor Title Insur. Co. of

Fla., 569 F.3d 154 (4th Cir. 2009), to argue that this Court

should defer to the Department's specialized knowledge of the

reimbursement procedure and therefore decline to hear this case

until TLC receives a final administrative decision. As

discussed above, the Department's specialized knowledge, while

potentially valuable, does not alone preclude the Court from

exercising jurisdiction. Moreover, the unripe claims in Arthur

were based on Maryland state common law, did not implicate a

federal statute, and were not brought under Section 1983. Id.

at 161-62.

In addition to the absence of applicable authority

supporting the Department's ripeness claim, the argument also

fails on two additional and more persuasive grounds. First and

foremost, this dispute is ripe for review because: (1) it

represents a real, substantial controversy fit for judicial

decision; and (2) withholding court consideration would cause

hardship to TLC. As evidence, TLC has struggled to provide

services to its patients as a direct result of funding

shortfalls allegedly exacerbated by the Department's failure to

comply with its statutory obligations. Second, requiring a

final administrative action in this case would be tantamount to requiring exhaustion and would therefore subvert Section 1983 access to the federal judiciary. As discussed above, Congress did not intend to require exhaustion in actions for violations of the Medicaid Act, and the Department cannot escape this lack of Congressional intent by advocating for what amounts to the imposition of a back-door exhaustion requirement. TLC's lawsuit is timely, ripe and justiciable, and the Department's Motion to Dismiss will be denied in its entirety.

## III. SUMMARY JUDGMENT

Because TLC's Complaint will not be dismissed, the Court will now consider TLC's Motion for Summary Judgment on both substantive causes of action.[7]

### A.    LEGAL STANDARD

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

---

[7] TLC's Complaint delineates a third cause of action for "Deprivation of Right to Receive FQHC Services." This cause of action is premised on the notion that the Department's alleged deficiencies have deprived Medicaid beneficiaries of the right to FQHC services. Because FQHCs have standing of their own as beneficiaries under the Medicaid Act, this cause of action is at best redundant and adds nothing to TLC's Complaint. See n.20, infra. Accordingly, the Court will not address it as a separate claim.

P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. <u>Id.</u> at 323. The non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1129 (4th Cir. 1987).

If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits, or other documentation which demonstrates that a triable issue of fact exists for trial. <u>Celotex</u>, 477 U.S. at 324. Unsupported speculation is insufficient to defeat a motion for summary judgment. <u>Felty</u>, 818 F.2d at 1128 (citing <u>Ash v. United Parcel Serv., Inc.</u>, 800 F.2d 409, 411-12 (4th Cir. 1986)). Furthermore, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). Thus, only disputes over

those facts that might affect the outcome of the case under the governing law are considered to be "material." Id.

### B.   REMEDIES CURRENTLY AVAILABLE TO TLC

Before addressing the merits of TLC's Motion for Summary Judgment, the Court must pause to discuss (1) the limited nature of the remedies available in a Section 1983 lawsuit brought against a state; and (2) the relief available via other procedures not currently at issue but which may be more applicable to this dispute.

#### i.   The Remedial Limits of Section 1983

Section 1983 actions against states or state agencies, when filed in state court, are not subject to the Eleventh Amendment bar against money damages that operates against similar actions filed in federal court. Will v. Michigan Dep't. of State Police, 491 U.S. 58, 63-64 (1989). Where, as here, a state removes a Section 1983 action against it from state court to federal court, the state waives its Eleventh Amendment defense. Lapides v. Bd. of Regents, 535 U.S. 613, 619 (2002). Because this action was first filed in Maryland state court, the Eleventh Amendment does not bar the award of retroactive monetary relief.

TLC, however, faces a more profound obstacle in its pursuit of money damages. This is because Section 1983 does not provide a vehicle for plaintiffs to enforce federal statutory rights

against state agencies in state court when such enforcement would involve retroactive monetary relief. Will, 491 U.S. at 71; Manikhi v. Mass Transit Admin., 758 A.2d 95, 110 (Md. 2000). Neither state agencies nor state officials acting in their official capacity are "persons" under Section 1983 when sued for retroactive damages, and therefore Section 1983 does not enable recovery in such disputes. Will, 491 U.S. at 71.

While a plaintiff may not obtain retroactive relief in a Section 1983 action against state officials in state court because such officials are not "persons" under the statute, the same is not true for actions seeking prospective relief. In one of the great legal fictions of American jurisprudence, the prospective nature of the relief sought magically transforms state officials into "persons" under Section 1983, even though the same state officials are deemed something else in actions for retroactive damages. Will, 491 U.S. at 71; see also id. at 92 (Stevens, J., dissenting). As a consequence, TLC may obtain only prospective injunctive relief from this Court. Jackson v. Millstone, 801 A.2d 1034, 1044 (Md. 2002). Money damages are unavailable.

Notwithstanding this seemingly artificial distinction, the Court may still require the payment of money as part of an injunction controlling future behavior. Id. The mere fact that implementation of prospective relief may require the expenditure

of substantial sums of money does not change the nature of the relief from permissibly prospective to impermissibly retroactive. Id. (citing Antrican v. Odom, 290 F.3d 178, 185-86 (4th Cir. 2002), for the proposition that "[s]overeign immunity does not preclude the plaintiffs from obtaining 'an injunction mandating that in the future, State officials bring the [state] Medicaid program into compliance with the Medicaid Act. This mandate might potentially impact the State treasury, but it is nonetheless prospective.'"). Antrican's conclusion is based on Edelman v. Jordan, 415 U.S. 651 (1974), and Milliken v. Bradley, 433 U.S. 267 (1977). Unlike the case here, both Milliken and Edelman involved claims filed in federal court that implicated the Eleventh Amendment. Yet, while the bar on monetary damages in those cases is different than it is here, the operative analysis between retroactive and prospective relief is the same. The Maryland Court of Appeals' citation of Antrican in Jackson validates this conclusion within the context of state court actions against state officials under Section 1983.

The distinction between retroactive and prospective relief "will not in many instances be that between day and night." Edelman, 415 U.S. at 667. Here, too, both Edelman and Milliken are instructive. Edelman involved a class of plaintiffs who claimed they were improperly denied disability benefit payments owed under a Social Security Act program jointly administered by

the federal and Illinois governments.  The district court
ordered Illinois to comply with federal statutory requirements
and to pay plaintiffs certain accrued benefits to which they
were entitled.  Deeming the accrued benefits "equitable
restitution," as opposed to money damages, the Seventh Circuit
affirmed the district court's opinion.

On appeal, the Supreme Court reversed.  Although the
plaintiffs were deprived of benefits to which they were legally
entitled, the Edelman Court held that requiring the state to pay
the equitable remedy was "in practical effect indistinguishable
in many aspects from an award of damages against the State."
Edelman, 415 U.S. at 668.  Edelman was filed in federal court,
so money damages were barred by the Eleventh Amendment.  In
contrast, the prospective portion of the relief granted in
Edelman—namely, the injunction—was permissible to the extent it
sought "payment of state funds . . . as a necessary consequence
of compliance in the future with a substantive federal question
determination."  Id.

Milliken, decided three years after Edelman, adds color to
the Supreme Court's outline of permissible and impermissible
relief.  There, the Supreme Court reviewed an injunction that
required the state of Michigan to pay one half of the costs
attributable to a plan to desegregate Detroit's public schools.
Holding the payment permissible, the Milliken Court further

reaffirmed the prospective-compliance exception to the Eleventh Amendment bar on money damages. Milliken, 443 U.S. at 289. The exception "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury." Id. The inquiry, therefore, "must focus, not on whether the injunctive relief sought would have an impact on the State treasury, but on the prospective-retroactive distinction as delineated in Edelman and Milliken." Antrican, 290 F.3d at 186.

The effect on the instant litigation of Will, Edelman and its progeny, and Jackson is twofold. First, the reach of this Court's Order in Three Lower Counties I and the Fourth Circuit's Mandate in Three Lower Counties II is limited to prospective relief only, because as that case was filed in federal court, retroactive damages were barred by the Eleventh Amendment. Thus, to the extent TLC argues that this Court's prior decisions authorized retroactive damages, TLC must be incorrect. As a matter of law, therefore, TLC cannot recover, under any theory, money damages for claims that were submitted but allegedly not paid prior to the operative injunctions issued in Three Lower Counties I and II.

Second, given TLC's exclusive reliance on Section 1983 for a cause of action in this lawsuit, the Court cannot grant

retroactive money damages to TLC even if TLC's allegations are found to be true.  Instead, this Court may grant only prospective injunctive relief, with the caveat that such prospective relief may require the payment of money where such payment is required for future compliance.  Otherwise, TLC cannot recover the money it seeks in this action as it is currently framed.

### ii.  Remedies Available in Enforcement Actions[8]

While this Court cannot award retroactive damages in a lawsuit like the one here—and thus cannot award TLC the money it alleges it is owed in accordance with the Fourth Circuit's prior decision—the Court is not without recourse when the state refuses to comply with its orders.  "In exercising their prospective powers under Ex Parte Young and Edelman v. Jordan, federal courts are not reduced to issuing injunctions against state officers and hoping for compliance."  Hutto v. Finney, 437 U.S. 678, 690 (1978) (discussing the award of attorney's fees against a state agency).  "[W]here a state expresses its unwillingness to comply with a valid judgment of a federal district court, the court may use any of the weapons generally

---

[8] The following discussion is included purely as dicta for the benefit of the parties in untangling a dense area of federal law under Section 1983.  Its inclusion is not, nor is it intended to be, any analysis or validation of the merits of the courses of action discussed, nor is it intended to exhaustively catalog all of the alternatives potentially available to TLC.

at its disposal to ensure compliance. . . . If statutory
authority is needed for the court's actions, it may be found in
Fed. R. Civ. P. 70." Gates v. Collier, 616 F.2d 1268, 1271 (5th
Cir. 1980). Thus, "[o]nce issued, an injunction may be
enforced." Hutto, 437 U.S. at 690.

Federal Rule of Civil Procedure 70(a) provides: "If a
judgment requires a party to . . . perform . . . [a] specific
act, and the party fails to comply within the time frame
specified, the court may order the act be done." Rule 70 also
permits the Court to hold a disobedient party in contempt. Fed.
R. Civ. P. 70(d). To seek relief under Rule 70, a petitioner
must file a motion in the proceeding in which it was granted
judgment, because Rule 70 does not supply a jurisdictional basis
for a new action. See Analytical Engineering, Inc. v. Baldwin
Filters, Inc., 425 F.3d 443, 449 (7th Cir. 2005). Here,
therefore, TLC would need to move the Court in Three Lower
Counties I.

Of course, Three Lower Counties I was filed in federal
court and is therefore subject to the Eleventh Amendment bar on
money damages. See Edelman, 415 U.S. at 666-67. But a proper
Rule 70 motion would not seek retroactive damages. Rather, the
motion would seek to enforce the Court's prospective injunction.
Although the injunction's enforcement may require the payment of
at least some money, money paid to comply with a prospective

injunction is permissible under <u>Edelman</u> and <u>Milliken</u>.  Thus, if

the Court were to find that the Department failed to fully

comply with the Court's earlier Order to provide fully

compensatory supplemental payments, TLC would be entitled to

reimbursement for any claims it submitted to the Department

after the date of the injunction.[9]  A Rule 70 motion will not,

however, enable TLC to recover for claims submitted and unpaid

prior to the injunction, because the injunction was purely

prospective in nature.[10]

That said, the Court is compelled to remind the parties

that the discussion above is included purely for the parties'

edification and does not constitute any position regarding the

merits of a Rule 70 motion.  The Court has not been asked to

contemplate anything other than the merits of TLC's current

---

[9] Whether the Department actually complied with the injunction is obviously in dispute, as that question forms the basis of the instant case.  The Court addresses this question in further detail below.

[10] Alternatively, it appears a plaintiff in Maryland may be able to seek enforcement of a judgment in state court via a lawsuit alleging a common law claim of "action upon a judgment," though it is unclear at this time whether Maryland law provides any precedent for such an action when the predicate judgment is limited to injunctive relief.  TLC does not allege this cause of action in the instant case, however, and the Court declines to speculate on its merits.  Nevertheless, were TLC able to conjure a viable theory for action upon a judgment, its recovery would be similarly circumscribed, because as explained above this Court's prior decisions and that of the Fourth Circuit were, as a matter of law, limited to prospective relief.

Complaint, and it need not address these ancillary issues any further.[11]

## C. COUNT I: STATUTORY VIOLATION AND DEFICIENT SUPPLEMENTAL PAYMENT

The limits of the relief available to TLC now properly defined, the Court turns to the merits of TLC's claims. TLC's first cause of action alleges that the Department has habitually failed to provide TLC with fully compensatory supplemental payments. Specifically, TLC alleges that the Department has failed to reimburse TLC for over 18,000 patient visits incurred over a ten year period.

This dispute is purely a question of fact. The Department does not dispute its obligations under the law. In support of its Motion for Summary Judgment, TLC has submitted several lengthy exhibits purporting to show the number of patient visits for which the Department acknowledges it must reimburse TLC, along with a number of other exhibits meant to prove that the Department's reimbursement checks habitually fell short. See, e.g., Summ. J. Reply, Ex. E-O, ECF Nos. 20-5 – 20-15. TLC also submitted two declarations of Joshua Boston, TLC's Chief

---

[11] Not only does the Court decline to address the merits of a Rule 70 motion, it also recognizes that such a motion would likely present several unanswered questions. For example, it is not clear which Order entered in Three Lower Counties I TLC may seek to enforce with a Rule 70 motion. As this issue is exceedingly attenuated from those currently under review, the Court declines to speculate any further on it.

Information Officer, who synthesized TLC's exhibits in several spreadsheets (TLC Spreadsheets) intended to summarize the Department's deficiencies.  Mot. Summ. J., Ex. A, ECF No. 16-3 & Summ. J. Reply, Ex. D, ECF No. 20-4 (Boston Declarations).

As evidence in TLC's favor, TLC first points to a series of letters issued monthly by the Department to TLC regarding the number of "encounter visits" for which the Department has received information (Encounter Data Reports).  See, e.g., ECF No. 20-13 at 4.  The Encounter Data Reports summarize the contents of a floppy disk enclosed with each letter.  Each disk includes raw data regarding all claims for reimbursement the Department has received over the prior month.  Thus, for example, the disk enclosed with the Encounter Data Report dated February 12, 2009, includes information regarding all claims received by the Department during January 2009 (January 2009 Disk).  Id.  The encounter visits for which the Department receives information in a given month, however, need not have occurred during that month; many visits are submitted several months after they take place.  Furthermore, each disk may contain multiple entries for a single patient visit.  Thus, the number of raw data entries on a disk does not correspond directly to the number of patient visits claimed.

To address this disparity and ostensibly to avoid confusion, the Department includes on each Encounter Data Report

33

the number of individual encounter visits contained on the
associated raw data disk (Department-Calculated Visit Total).
Each encounter visit corresponds to one patient visit.  The
Department calculates the total number of encounter visits
contained on each raw data disk by counting only unique patient
visits and excluding superfluous line item entries and procedure
codes.  For example, the Encounter Data Report of February 9,
2005, explains:

> The number of procedure codes and the number of visits
> may not be the same, because each FQHC encounter visit
> can be comprised of several different procedure codes.
> Each procedure code does not count as a visit;
> therefore the number of lines on your disk may exceed
> the visit count.  The number of encounter visits
> submitted for the month of February is 908 for medical
> encounters and 146 for dental encounters.  If there is
> a significant discrepancy in the number of visits that
> your center has submitted to the MCO and what the
> Department has received from the MCO, please contact
> the reporting MCO.

ECF No. 20-9 at 4.[12]  As is evident from the language of the
Encounter Data Reports, the Department-Calculated Visit Totals
represent the number of unique patient visits for which the
Department has received information from the MCOs.  Neither the

---

[12] Later letters contain different but similar language.  For
example, the Encounter Data Report dated February 12, 2009,
states, "The numbers listed below indicate the number of
encounter visits reported for the month of January, however, the
disks includes [sic] individual line items for services included
during each visit/encounter.  Therefore, the numbers listed
below will not match the list of encounters on the disk."  ECF
No. 20-13 at 4.

MCOs nor the FQHCs participate in the calculation of these numbers.

The Department-Calculated Visit Totals provide the basis for all of TLC's later calculations regarding the Department's alleged deficiencies. TLC assumes this number, because it was calculated exclusively by the Department and represents the number of individual patient visits for which the Department received information, is equivalent to the number of patient visits for which TLC is entitled to reimbursement. This assumption is further supported by other Department communications that equate "encounter visits" with reimbursable visits.[13]  See, e.g., ECF No. 20-12 at 18.

The Department, however, briefly refutes this equation yet provides no supporting evidence. The Second Declaration of Michelle Lehner, Chief of the Department's division charged with administering payments to FQHCs, claims only that "[a]n encounter visit is not a claim for payment." Summ. J. Surreply, Ex. A at 2, ECF No. 21-2 (Lehner's Second Declaration). If in fact there were a legally operative distinction between the Department-Calculated Visit Total and the number of visits for which TLC is entitled to reimbursement, the distinction would undermine TLC's entire analysis. Unfortunately, however, the

---

[13] These communications are discussed further below as Supplemental Payment Letters.

Department fails to expound on this alleged distinction, either in Lehner's Second Declaration or anywhere else. As a result, the Department has presented no evidence to controvert TLC's facially reasonable reliance upon the Department-Calculated Visit Total.

Although each Encounter Data Report indicates the aggregated Department-Calculated Visit Total for each month, the reports do not identify the dates on which the individual visits took place. For instance, the January 2009 Disk includes visits with dates of service (DOS) as far back as 2007, but the associated Encounter Data Report does not indicate as much.[14] As a consequence, TLC has had considerable difficulty tracking the number and identity of the claims for which it has been paid. To determine which visits were aggregated in each Encounter Data Report, TLC extracted the dates of service for each visit contained in the disks' raw data, and then correlated the DOS information with the visits as reported in the Department-Calculated Visit Totals. TLC presents the results of this process in Exhibit O to its Reply. ECF No. 20-15.

While Exhibit O purports to prove the number of visits for which TLC should have been paid, Exhibit N to TLC's Reply

---

[14] In fact, TLC's analysis of the raw data on the January 2009 Disk indicates the disk includes information for 2 claims with dates of service in 2007, 2,768 claims with dates of service in 2008, and 546 claims with dates of service in 2009. ECF No. 20-15 at 19.

summarizes the number of visits for which TLC has actually been paid. ECF No. 20-14. Exhibit N is based upon a series of letters issued quarterly by the Department to TLC, in which the Department reported both interim supplemental and final reconciliation payment calculations (Supplemental Payment Letters). See, e.g., ECF No. 20-13 at 18. The Supplemental Payment Letters, however, provided scant detail regarding the method and numbers the Department relied upon to calculate the final reconciliation payments. To wit, some letters did not include a final claim count and instead reported only a final dollar amount, which frustrated TLC's accounting and verification efforts.[15] Id. Nonetheless, TLC extracted from the Supplemental Payment Letters the quarterly totals of visits for which it has already been paid. TLC then contrasted those totals with data from Exhibit O, which contains TLC's analysis of the number of visits for which it believes it should have been paid. The final result of TLC's entire analysis, which

_____

[15] Even when the Supplemental Payment Letters do include detailed information, the added data further demonstrates the opacity of the Department's calculations. In one example, the Department used different per-visit supplemental rates for the same quarter. For the Third Quarter of 2003, it used $61.88 to calculate the interim payment but $72.72 for the final reconciliation payment. ECF Nos. 20-7 at 39 & 20-9 at 19. There is no explanation for this difference in the evidence before the Court. Many of the Supplemental Payment Letters also contain mislabeled numbers, but the above example sufficiently demonstrates the Department's dubious reliability and additional errors need not be catalogued for the Court's purposes.

appears at the front of Exhibit N, is compelling evidence that the Department has severely underpaid TLC since the inception of PPS.[16]

The Department presents a measure of its own evidence to refute TLC's conclusions. Of note are the declarations and exhibits submitted by Michelle Lehner. Summ. J. Resp., Ex. A, ECF No. 19-1 (Lehner's First Declaration); ECF No. 21-2. Lehner "disputes that [the Department] owes TLC any supplemental payments based on [the Department's] records." ECF No. 19-1 at 2. In support of her assertion, Lehner proffers three spreadsheets created by the Department allegedly "using the same charts as TLC and providing additional detail TLC did not provide." Id.; see also ECF Nos. 19-2 – 19-4 (Department Spreadsheets). In addition, Exhibit 4 to Lehner's First Declaration is a letter from Susan Tucker, Executive Director of the Office of Health Services,[17] in which Tucker refutes TLC's analysis and explains the method the Department used to create the Department Spreadsheets (Tucker Letter). ECF No. 19-5.

The Tucker Letter appears to expose a failure by the Department to thoroughly review TLC's analysis, and it offers

---

[16] Specifically, TLC alleges the Department has failed to reimburse TLC for 18,813 visits totaling $1,786,187.60. ECF No. 20-14 at 2.

[17] The Office of Health Services includes the Health Choice and Acute Care Administration, to which Michelle Lehner reports.

little as an alternative explanation of the data.  First, the
Tucker Letter attempts to indict TLC's analysis by reiterating
the assertion that the raw data contained within the disks
cannot be used to generate an accurate patient-visit count
because the disks contain duplicate encounter visits, laboratory
tests, and vaccinations, none of which are reimbursable.  This
argument fails because TLC did not rely upon the disk's raw data
to count patient visits, a fact TLC makes clear on several
occasions.  See Boston Declarations, ECF Nos. 16-3 & 20-4.
Rather, TLC relied upon the Department-Calculated Claim Totals,
which TLC then put in context with the dates of services
contained within raw data.  Id.  Thus, TLC excluded all non-
reimbursable encounter visits, at least to the extent the
Department did the same when calculating the Department-
Calculated Visit Totals listed in the Encounter Data Reports.
In light of TLC's submissions, the Department's objections to
TLC's analytical methods as listed in the Lehner Declarations
and the Tucker Letter are unpersuasive.

     The Tucker Letter also fails to provide a meaningful
explanation of the Department's analysis.  It states, "[t]he
number of visits eligible for payment is presented in the
attached charts under the category "Number of visits paid
through reconciliation."  ECF No. 19-5 at 1.  That the
Department automatically equates the two is no surprise, as the

Department claims to have fully reimbursed TLC, and it proves nothing. The letter continues by identifying various numbers contained within the Department Spreadsheets, but it provides no discussion of how the Department arrived at those numbers. See generally, id.

Turning to the Department Spreadsheets themselves, they also lend scant credibility to the Department. To be sure, the Department Spreadsheets do provide a measure of detail not contained in the TLC Spreadsheets; for example, they include monthly totals of claims for which the Department has already reimbursed TLC, whereas the TLC Spreadsheets include only quarterly totals. And the Department Spreadsheets also, like the TLC Spreadsheets, break down the number of claims payable to TLC by each MCO. Confusingly, however, the TLC Spreadsheets list several more claim-submitting MCOs than do the Department Spreadsheets, which may partially explain why the Department's count of claims received is lower than TLC's.[18] The Department provides no explanation for this disparity.

_____

[18] The Department also seems to ignore claims submitted well after the underlying services were rendered. For example, the Department issued its final reconciliation payment for January through June 2007 in a letter dated July 23, 2008. ECF No. 20-12 at 30. Yet, TLC alleges the Department received claims with dates of service during the first half of 2007 as late as 2009. ECF No. 20-15 at 15. Assuming TLC's analysis is correct, such claims could not have been included in the Department's final reconciliation calculations, and this may also account for some of the disparity. Whether such late-submitted claims are timely

But the most substantial hindrance to the Department's credibility is its lack of analytical transparency. The Department never explains how it arrived at its numbers, how it analyzed the raw encounter visit information, or even what data it relied upon. In contrast, TLC identifies its dataset, which included the Department-Calculated Claim Totals and raw data disks, provides an exhaustive analysis of all the data included on the raw data disks, correlates DOS information from the disks to the Department-Calculated Claim Totals, and then presents the resulting information in dense but comprehensive summary spreadsheets.[19] Unless the Department-Calculated Claim Totals are incorrect, which is to say unless the Department habitually provided incorrect information to TLC in its Encounter Data Reports, it is hard to imagine any explanation that would refute TLC's analysis, and in any event the Department has not presented one. Consequently, neither the Department Spreadsheets nor the Lehner Declarations and Tucker Letter do

---

and otherwise reimbursable is irrelevant to the resolution of this case, however, and the Court need not address the question further.

[19] To the extent possible without the benefit of the Department's raw data, the Court was able to cross-check and recreate many of TLC's spreadsheets. The Court is satisfied that TLC's spreadsheets are, at a minimum, generally internally consistent. The conclusions TLC relied upon to create the spreadsheets—and those TLC derived there from—appear logically sound.

much to advance the Department's position.  At best, they merely confirm the Department's disagreement with TLC.

Based upon a thorough review of both parties' submissions, the Court finds compelling evidence that the Department, by the Department's own calculations, has failed to fully reimburse TLC for claims TLC properly submitted for payment.  Unfortunately for TLC, however, the Court's review also revealed mistakes in TLC's calculations.  For example, TLC's spreadsheet entitled "2007 DHMH Visits and Encounters Comparison," ECF No. 20-15 at 16, correctly aggregates the Department-Calculated Claim Totals for all dental claims submitted from January 2007 to December 2007 as 3,176.  This number is based up the Department's Encounter Data Reports and associated raw data disks sent to TLC during the calendar year 2007.  Yet, TLC's analysis alleges that 2,416 of those patient visits occurred during the calendar year 2008.  Id.  This is not possible.  A disk created and sent to TLC in 2007 cannot have information regarding claims arising from services rendered in 2008.

The presence of at least one critical error in TLC's analysis casts doubt upon the precision of TLC's remaining conclusions.  TLC's submissions may, broadly speaking, indicate strongly a meritorious claim, but they are insufficient to inspire dispositive confidence in TLC's final calculations. Moreover, the complexity of the analysis involved, coupled with

a lack of independent verification and discovery, weighs heavily toward withholding judgment at this time. As such, the Department's submissions, including its pleadings, the Lehner Declarations and the Department Spreadsheets, demonstrate sufficiently, though narrowly, a genuine dispute of a material fact, and the Court will deny TLC's Motion for Summary Judgment on this issue.

If TLC had been successful, however, precise calculations of dollar amounts owed would still be irrelevant. As discussed above, TLC cannot, as a matter of law, obtain retroactive damages in this action. Instead, this Court is limited to ordering injunctive relief. As TLC no longer operates under the PPS system, it is unclear whether the Department continues to be engaged in any PPS claim processing that may be the subject of an injunction. The parties are therefore encouraged to consider the very limited nature of the relief available in this action should they choose to engage in lengthy discovery.

D.   COUNT II: FAILURE TO REIMBURSE FOR CERTAIN OUT-OF-NETWORK SERVICES

TLC's second cause of action also relates to statutorily-required reimbursement payments. TLC specifically alleges the Department has failed to compensate TLC for providing emergency care to out-of-network patients as the Department is required to do by federal statute.

Section 1293b(m)(2)(A)(vii) of the Medicaid Act demands that contracts between the Department and Maryland MCOs explicitly provide for payment to FQHCs for services the FQHCs render to out-of-network patients when such patients need "medically necessary" care that is "immediately required due to an unforeseen illness, injury, or condition."  42 U.S.C. § 1293b(m)(2)(A)(vii).[20]  This statute's "unmistakably clear" language "requires either the State or the managed care organization to compensate a health center for emergency services provided to Medicaid patients, even if the health center is out-of-network.  And when the health center is an FQHC, as is Three Lower Counties, § 1396a(bb)(5) requires that the health center's compensation be equal to the statutory per-visit rate."  Three Lower Counties II, 498 F.3d at 304.

The Department does not argue its responsibility.  In response to the Fourth Circuit's ruling in Three Lower Counties II, the Department has taken steps to comply with the Medicaid

---

[20] This statute does not absolutely require states to insert this provision into MCO provider agreements.  Rather, as it must, the statute conditions the State's receipt of federal funds on the State's compliance with it.  Because compliance with the statute is mandatory for the receipt of federal funds, and because the statute confers a federal right on FQHCs as intended beneficiaries, TLC, as an FQHC, may seek redress for violations of the statute under Section 1983.  See Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 509-12 (1990).  Moreover, the Fourth Circuit, without directly addressing the issue of standing, previously ruled TLC is entitled to relief on precisely this question.  Three Lower Counties II, 498 F.3d at 304.

Act, but the parties dispute whether the Department's actions are sufficient. Specifically, the Department recently issued "MCO Transmittal No. 80" to all MCOs and FQHCs acknowledging its responsibilities.[21] ECF No. 16-6 (Transmittal). In the Transmittal, the Department advises that:

> [The Medicaid Act] requires coverage of out-of-network health centers for services provided to a managed care organization's enrollees when such services are immediately required . . . Therefore, for dates of service beginning October 1, 2010, the managed care organizations (MCOs) must begin paying for such services when rendered by any federally qualified health center (FQHC) that participates with the Maryland Medicaid Program but does not have a contract with the MCO.

Id. The Transmittal continues by setting forth criteria the Department established to guide FQHCs and MCOs when processing such claims for payment. The Department notes "[i]t is the FQHC's responsibility to verify with the enrollee's primary care provider that the enrollee cannot be seen within a reasonable amount of time based on the severity of the enrollee's condition." The Department further advises that MCOs may require documentation from FQHCs to verify that: (1) the patient's primary care provider was indeed unavailable at the time of service; and (2) the patient's care was "immediately

---

[21] Consistent with the Department's glacial pace of compliance with this Court's Orders, it issued the Transmittal over three years after the Fourth Circuit's decision in Three Lower Counties II and only after TLC filed the instant suit complaining of the same statutory deficiency the parties litigated from 2005 through 2007.

required due to an unforeseen illness, injury, or condition."
Id.

Although the Transmittal acknowledges that the Medicaid Act requires payment for out-of-network emergency services, TLC complains it does not cure the Department's deficiency because the law demands that provider agreements between the MCO and the State contain language requiring such payment.  The Department counters that its Transmittal, as a statement of existing law, is incorporated by reference into the existing MCO provider agreements without the need for a formal amendment, because laws affecting particular contracts are incorporated into the contracts by implication.  See, e.g., Post v. Bregman, 686 A.2d 665, 674 (Md. 1996) (noting that Maryland laws and regulations in effect at the time a contract is created are incorporated as implied contract terms unless the parties explicitly state the contrary), rev'd on other grounds, 707 A.2d 806 (Md. 1998).  TLC responds that the letter's reimbursement guidelines, which are meant to effectuate the law but are not required by it, are not incorporated by reference because they are not contained in the statute.  In essence, TLC argues that the letter does not carry the force of law and therefore is not fully incorporated into the MCO provider agreements.

The Transmittal is problematic for two reasons.  First, it is not an accurate statement of the law.  The law "requires

either the State or the managed care organization to compensate
a health center for emergency services provided to Medicaid
patients." Three Lower Counties II, 498 F.3d at 304 (emphasis
added). The statute does not specify which of the two entities
must compensate the FQHCs, so it does not explicitly place the
burden of such payments on the MCOs. The Transmittal's
assertion that "managed care organizations . . . must begin
paying for such services" is therefore incorrect and
unenforceable on the MCOs, because exclusive MCO payment of out-
of-network emergency claims is neither required by law nor a
bargained-for term in the provider agreements.[22] Thus, the
Department's implied incorporation argument does not cure its
deficiency.

Even if the Transmittal was an accurate statement of the
law, it would be problematic for a second reason. The statute
does not supply the mechanics for out-of-network reimbursement,
so the Transmittal's guidance regarding reimbursement criteria
is purely a Department creation out of whole cloth. Thus, the
guidance is not a statement of statutory or regulatory
requirements. Moreover, the Transmittal, as an informal

---

[22] The Court reaches this conclusion without the benefit of the
text of the relevant MCO provider agreements. While it is
possible that some other provision of the provider agreements
automatically requires MCOs to pay liabilities that the State
might otherwise be obligated to pay, neither party raised this
argument.

communication meant to provide notice to MCOs and other interested parties of the Department's activities, does not carry the force of law by itself, and, as such, would not be incorporated by implication into the MCO provider agreements.

Unfortunately, the operative provision of the Medicaid Act is unclear as to whether MCO provider agreements must also explicitly include language setting forth a reimbursement mechanism. Instead, the provision states merely that either the state or the MCO must "provide[] for reimbursement" for out-of-network services. 42 U.S.C. § 1293b(m)(2)(A)(vii). The question of whether such contractual language is necessary is not before this Court; however, the Court notes that other Medicaid reimbursement procedures are effectively promulgated via administrative regulation.

In sum, the Medicaid statute demands that MCO provider agreements provide for reimbursement for emergency health care services rendered by FQHCs to out-of-network patients. The reimbursement must come from either the MCO or the State, but the statute is silent as to which. The Department's Transmittal, for the reasons stated above, does not bring the Department's MCO provider agreements into statutory compliance, and therefore this Court will grant TLC's Motion for Summary Judgment on this issue and order the Department to comply fully

with its obligations as set forth in the Medicaid Act and <u>Three Lower Counties II</u>.

Although the Court finds the Department is not currently compliant with its statutory obligations, nor has it been at least since the Fourth Circuit's decision in <u>Three Lower Counties II</u>, TLC cannot recover money damages for unreimbursed out-of-network emergency services it rendered in the past. Such relief, as stated above, is unavailable in this Section 1983 action. Accordingly, the Court can grant only injunctive relief.

**IV.  CONCLUSION**

For the foregoing reasons, the Department's Motion to Dismiss will be denied, and TLC's Motion for Summary Judgment will be granted in part and denied in part. A separate order will issue.

                          _____/s/_____
                          William M. Nickerson
                          Senior United States District Judge

January 5, 2011